Good morning, your honors. My name is Lisa Cantor and I am pleased to be here this morning representing the plaintiff and appellant Janene Harlick, and I would like to reserve two minutes for rebuttal. I'll try to watch the clock here. Okay. It counts down, as you can see. Yes, thank you. Ms. Cantor, before you begin. Yes, sir. I guess here Blue Shield agreed to be defendant in this case? Yes, in place and instead of the plan, correct. Okay. Because it wouldn't normally be our law that they ought to stand for the plan yet, right? Yes, our law requires the plan to be the defendant. We served the plan and then there was a stipulation dismissing the plan and they agreed to be the defendant. All right. Thank you. Janene Harlick has anorexia, which is defined as a severe mental illness. And under the California Mental Health Parity Statute, which is at the center of this appeal, she was protected and the statute was designed to end discrimination against patients like her. The statute accomplishes this by requiring that all health insurance plans cover severe mental illnesses like anorexia under the same terms and conditions as they cover physical illnesses. But the plan at issue here, written by Blue Shield, violates this statute in two related ways. Can I get a preliminary matter? Yes. And this is just a question of statutory language. Yes. You recited the language properly. This is the Mental Health Parity Act. It requires that severe mental illness be covered under the, quote, same terms and conditions. As I read terms and conditions in subsection C of that statute, that refers to things like copay, deductible and so on. That's what terms and conditions mean. It says including but not limited to terms, copayments, deductibles and other things. Right. But what I'm driving at is, as I read this, terms and conditions does not refer to coverage. It refers to how it's paid for, whether with a deductible, whether with a copay and so on. No, it is coverage as well, Your Honor. It is coverage as well. That's the wrong answer from your standpoint. What case says that? Well, I think the statute says that. If you read the coverage, if you read the statute as a whole, the types of coverages that you offer have to be the same. The types of coverages you're offering. Well, maybe, but I'm not sure I agree with you, because if that's the right answer, you've now got to deal with the word same. Same. I don't think you want to deal with the word same. I don't want to. No, I don't. The same to me means comparable. I don't think it has to be the same. It has to be comparable. Yeah, but the word is same. Yes, I understand that, and that's problematic. But as I read the statute, terms and conditions does not refer to coverage. It refers to, because each one of those things that's listed is maximum benefits, copayments, deductibles, and under the theory of use and generous, anything else that's not included has to be in that same category. Are you with me? Okay, I'm with you. It's in your interest to be with me. You can walk away from it. No, I'm going to walk away from what I said before and ask you the question again. You're under C-1, 2, and 3. Correct. Okay. So what you have to apply equally are the lifetime benefits, copayments, and individual and family deductibles. Correct. That's the question I'm asking. Correct. The benefits that you have to offer are comparable. Does that answer the question? The question I have is what do terms and conditions mean? Right. I'm sorry. I answered the question improperly. Terms and conditions mean what's under C-1 through 3 and maybe other things. Okay. The benefits have to be similar. That's a different question. The coverage, that's a different question. Terms and conditions here specifically means things like deductibles, copays, et cetera. Correct. Okay. Correct. Well, if that be the case in this particular plan, at a skilled nursing facility, the plan covered both treatment for mental and physical illnesses, didn't it? Not according to Blue Shield. Well, but just a minute. According to the plan, as long as they went to a skilled nursing facility, quote, unquote, the plan would cover the treatment for both mental and physical illnesses. Well, here's the problem, Your Honor. A skilled nursing facility only treats physical illnesses. By definition under the plan, a skilled nursing facility offers skilled nursing care. Skilled nurses only treat physical illnesses because they're nurses. They treat physical illnesses. The comparable coverage for severe mental illness are residential treatment facilities. And that's where we have the problem. Because in this plan, there is a specific exclusion found only in the mental health section of the plan for residential care. And that's why this plan violates the mental health statute. Because you have an exclusion in the mental health side for residential care and you have coverage on the physical side for skilled nursing. They're both subacute levels of care that treat somebody who's not sick enough to be in a hospital but is too sick to be at home. So they're comparable coverage, but they're not being provided. And so there's a violation of the statute. And that's the crux of our appeal here. Blue Cross says there's perfect parity because, as you say, if you have an eating disorder, just go to a skilled nursing facility. But I challenge them today to identify, one, a single skilled nursing facility in California that will treat an eating disorder. There aren't any because they don't treat eating disorders. They treat physical illnesses. Residential treating facilities treat eating disorders. And that's the problem. On the other hand, they say, well, we also have perfect parity because we don't offer residential care for physical illnesses. Well, their plan doesn't say that. Their plan only says we don't offer residential care for mental illnesses. So there's a problem here in what the plan says as opposed to what the statute requires. Now, I'd like to take a moment to... from Watson. When the letter came from Watson to the DMHC, the letter says, Janine is protected by CA parity law and the insurance company is not paying the claims. Yes. Then the DMHC said, Blue Shield has complied with its responsibilities under the applicable health plan regarding your request. That's what the response said. Correct. Because the DMHC, under the statute, the IMR statute, which is the independent medical review statute, is only reviewing medical necessity determinations. It does not make coverage decisions. And at that point in the process, remember, there was a medical necessity dispute at one point, and so she was trying to get help with that. But if you look at the relevant statute, which I will give to you in a minute. Well, as I understood it, though, the responder, George, was full well available, knowledgeable about what he had to do here. And there's nothing here that says that it's any specific law that the response is going to. He knows about having been a contributor to the mental health parity survey. That's out there. I guess I'm again coming back to why would they give such a response, given his knowledge of that? I would say he was outside his bounds. Let me go back and tell you the sequence of events.  We're all confused about what the jurisdiction is of both of the agencies. It gets sent to the Department of Managed Health Care. Blue Shield writes to the Department of Managed Health Care and says, this case does not qualify for IMR review. That's at ER 2651. Okay, hang on a second. I need to follow this. Okay. ER? 2651. Okay. I'm looking at it. 2651. Oh, I see. Volume 2. I'm sorry. No. Number 2651 on the bottom. ER number 2651. I didn't bring that up. I didn't bring it up. I know. It's so bad. I didn't bring it either. They check a box that says this does not qualify for IMR review. Because the IMR review. I have to say, you could have choked ten horses with the ER you gave us. I apologize for that. But the record was so huge, and I'm required to give it all to you. No, you're not. Well, it's an ERISA case, and I always worry about not giving you everything. So Blue Shield says this doesn't qualify because the IMR review only has to do with medical necessity reviews, not coverage. This is a coverage dispute. Nevertheless, the DMHC decides to go forward. They write a letter to Blue Shield, and they ask five questions. This is at ER 2653 to 5-4. And question number five was, why won't you consider her treatment as being payable, comparable to the skilled nursing? Blue Shield writes back. This is at ER 853 to 855. And they only answer questions one and two. They don't respond about the skilled nursing question. And then the DMHC writes back, and this is at ER 38110, and says you don't have to pay because the policy says there's no residential treatment. But never analyzes, well, what about the parity statute? What about the fact that there's an exclusion on the mental health side, and there's coverage on the physical side, and there's a problem here? And I would argue, Your Honor, that under the statute, the IMR statute, the DMHC doesn't have the authority to do that, because it specifically says in that statute, we don't make coverage decisions, we only decide medical necessity issues. So the counsel was trying to be helpful, and he said something in there about coverage, but he wasn't making a parity determination. He was saying your plan says no coverage, and so there's no coverage. You're referring to California Health and Safety Code 1374.30. 30, exactly. A decision regarding a dispute of health care service relates to the practice of medicine and is not a coverage decision. Correct. Is there anything else that gives Mr. George the authority to make a coverage decision? There is not. Because they can tell me that there is. But I read that statute, and it says if he's ruling under this, whatever he says, he has no authority to make a coverage decision. And I guess Blue Cross is now invited to say is there some other statute under which he was acting. Correct. Okay. There's no authority for him to make a coverage decision. So are you through with what you had to say there? Yes. Because I really believe that this is the ultimate question right here that you're going at. Let's look at the survey. The survey was implemented a part of the DMHC's authority to regulate and monitor managed health plans. It was undertaken to respond to legislators and consumers about whether parity had been achieved. When you look at it, it didn't identify any disparities between contractual terms and conditions used for medical versus mental health care coverage. No pattern of plans denying services for the mental health conditions that can be covered. And after the survey, the required actions did not include requiring coverage of residential care, though it discusses the care at length. Why isn't that enough? The survey was just that, it was a survey. Well, I understand it was a survey. But it was a survey that the DMHC really undertook to respond to legislators and consumers about this particular issue so that we're really concentrating now on what you're trying to suggest is wrong and they don't address it. Sure. The information in the survey was obtained between January and March of 2005. This policy, the plan at issue here was issued in June 2006. Well, I understand that. The system problems, there was no indication in any of the plans that were reviewed that any comparison was done to the physical parts, the physical coverage in the plans. In fact, if you look at the descriptions of the plans they were looking at, they described the different types of plans they were looking at. And some of them were, in fact, what we call carve-out plans, which are only mental health plans. So a good bulk of them were only mental health coverage with no comparison to the physical part of the plan. And a lot of employers do this. In other words, they'll have their mental health covered by a different insurer than their physical. So there was no opportunity to compare to what was covered on the physical side. There's no indication that any plan they looked at at all had a residential exclusion. And, in fact, they said that the plans... Well, now, just a minute. It seemed to me that it does discuss residential care quite at length in this survey. It says a lot of them do not. If you look at the language equally, carefully, it says the use, the coverage and use of residential treatment centers varies ranging from almost no coverage to coverage equivalent to or on par with skilled nursing. This is at ER 73 and 86. Generally... Because they were not comparing it to the physical side. They were not making a determination as to whether it was required, because there was no attempt to analyze and compare mental illness to physical illness and compare the coverages. You'd have to look at the physical coverages. They're only looking at the mental coverages. They were... In some cases, they were looking at carve-out plans and they were only looking at the mental health coverage. Parity, again, we're looking at comparison of coverages on one side to the other. They're looking at the delivery of mental health care under parity and what has happened to it under parity. In fact, at 87, they say, consensus among mental health professionals indicates the necessity of relatively prolonged residential treatment for such specific conditions as severe eating disorders and some dual diagnosis disorders. They recognize that some insurers do not believe in residential treatment. They recognize that. But there was no attempt to try to make a legal determination by comparing mental and physical disorders and analyzing what the Parity Act required. It was just an analysis of what was going on under the statute. And I went over it line by line, and there was no indication that any plan under there had an exclusion like in this plan for residential care. Okay. We mean the residential care is not covered. Right. No plan that they looked at said residential care is not covered. Well, Blue Shield also said someplace in their brief about checking the website on Castlewood and that it calls itself a residential facility and, therefore, it's not covered. Well, and my point is it may not be covered in a plan that doesn't have the comparable skilled nursing coverage on the physical side in a plan that is governed by the California Parity Statute. Your basic point is if the policy is going to cover somebody who has a severe mental illness, here specifically anorexia, in the real world in which these treatments are done, it's going to cover in a residential facility. Correct. And absent coverage for anorexia in a residential facility, there essentially is no coverage. Well, unless you're sick enough for a hospital or you can do it at home. Right. You're gutting the treatment system. And, further, I gather the record supports that she's shown medical necessity and she's shown medical necessity for which the treatment is sufficient if the treatment is done in a residential facility. They've conceded medical necessity. And if they conceded also. They did concede. But if they conceded also that treatment of this medical necessity is sufficient if conducted in a residential facility such as Castlewood. Yes. Okay. Got it. We've taken you over. I'm sorry. I said we've taken you over. Yeah. For which you need not apologize. And we'll give you two minutes to respond. Thank you. Good morning. May it please the Court. I'm Adam Pines. I'm a man at Phelps and Phillips for Respondent, Appellee Blue Shield of California. In her appeal, the appellant presents two essential arguments, one based on her contract and one based on the Parity Act. I'll address each in turn. The appellant's first argument is under the contract where she focuses on the definition of a skilled nursing facility. And looking at the words of that definition, she argues that Castlewood's treatment should be covered because it's, quote, unquote, similar to the treatment that's received at a skilled nursing facility. You know, I can't speak for my colleagues because we tend not to confer about these cases beforehand. For my own purpose, you win on that issue. The only way you will possibly lose is under the statute. Then I will jump directly to that. I'd agree with that. That's why I told her you've hit the big issue. Okay. I think you make it if she's only got one issue and it's the first. Sure. Where you lose is if you're going to lose on the second. The main point on the contract is that a skilled nursing facility is an established term. There are states that license those facilities, this facility's name. Did you just hear that you were going to win on that? I did. I did. Why don't you talk about the issue on which you might lose? That would be most helpful. Her second argument is under the Parity Act. There you go. And as the Court appropriately stated, the language of the Parity Act lists the benefits as to which plans must offer parallel coverage for medical and mental and physical conditions. And that's in subsection B of the Parity Act. Yeah. And there's a difference between subsection B, which lists the levels of care that must be equivalent, and subsection C, which lists the terms and conditions applicable to those levels of care. Right. And we would suggest, along with the Wayne W. Court that interpreted this provision, that that difference between section B and section C is significant. Now, explain to me what you mean. Sure. Subsection B says the benefits, the levels of care that must be provided shall include the following. And it lists outpatient services, inpatient hospital services, partial hospital and prescription drugs. And then on the terms and conditions that must be applied to those benefits, it says they must or they shall include but not be limited to the following. And it lists maximum lifetime benefits, co-payments, individual. Right. And the Wayne W. Court goes through the same reasoning. But the fact that part of the statute uses the phrase shall include. You know, there's a California regulation. Are you aware of that? On what? On what that subsection B means. Are you referring to section 1300.7472? Yes. And it talks about the mental health services required? Yes. Okay. So our first point on the statute is that those four levels of care are what's required by the Parity Act. And on the regulation, that's the agency, the DMHC, interpreting the act and fleshing out what those four levels of care include. To give it more detail. No, let me make sure you understand what I'm saying. The regulation adds to subsection B the words that you say are missing. The regulation says including but not limited to. If you didn't have the regulation, your argument might work. But there's a regulation that specifically answers the question. Well, there are two responses to that. The first one is that a regulator can't go beyond the coverage of a statute and expand what the legislature has required to be covered. Now, I understand federal law better than I understand California law. If you were making that argument under, say, Chevron or federal law, you're gone. Meaning this is clearly within the scope of a statute to have that regulation. I don't know whether California has the same rule, but to say that including means including but not limited to is clearly within the possible permissible scope of the word including. Even if you were to take that position, even if you were to assume that the DMHC had the power to require plans to cover things  to interpret the word including. Okay. To interpret the word including to mean including but not limited to. And therefore, to have the authority to expand the list of things that have to be covered. When you look at the regulations that they've enacted, it says the mental health services required by the Parity Act shall include but not be limited to basic health care services. So then you have to look at what basic health care services are. And when you look at those, there's no listing here of residential care facilities. It's the same things that Blue Shield offers. It's physician services. I'm looking at Section 1345 of the Health and Safety Code. And the basic health care services that that regulation talks about are physician services, hospital inpatient services, diagnostic laboratory and diagnostic and therapeutic radiologic services, home health services, preventative health services, emergency health services, and hospice. All of those things are available to Blue Shield subscribers with mental and physical conditions. But you didn't read the regulation. It says required under the Act including but not limited to basic health care services. And then you just read me the list of basic health care services, and it just said including but not limited to basic health care services. Okay. So I covered the first part. So now if you want to talk about the including but not limited to part. That's what I've been talking about the whole time. The DMHC has looked at these issues. On the first point, I'm sorry, it's looked at it twice. It did it first when it did a survey of California health plans compliance with the Parity Act. Looked at the plans compliance and found that whether coverage is offered for residential care as a matter of contract, and some plans offer it and some plans don't. We have confirmation of that in the Tompkins case that actually ordered Blue Cross, not Blue Shield California, my client, to cover residential care because the plan agreement, which is in the record here, the Tompkins plan agreement is in this record. That plan agreement said residential care is covered. Blue Shield, on the other hand, does not cover residential care, and it has not. Didn't cover it back when the DMHC did that survey. So on the DMHC survey, they looked at compliance with the Parity Act, found that plans offer it sometimes and others don't. Didn't suggest any problem with that. The survey is a really weird place to look as to how I should construe a statute. As you know, there's a dispute as to whether or not you should look to legislative history in helping us to interpret a statute. This isn't even legislative history. This is a survey conducted after the statute has been adopted, and you're asking me to use the survey to interpret a statute. The survey is conducted by the regulator charged by the State of California with enforcing and applying the Knox-Keene Act, of which the Parity Act is part. I understand that. And this also goes to the DMHC's response to the plaintiff's appeal here, where the plaintiff submitted her appeal, again, originally to the DOI. It got to the Department of Managed Health Care. The department confirmed that Blue Shield's decision was supported by the terms of its plan, and Blue Shield was not required to offer those services. The department has two functions in this respect. The first is independent medical review, which the plaintiff is focused on. The department also is charged with supervising Blue Shield's compliance with the Knox-Keene Act, and under that jurisdiction sanctions or has the power to sanction plans that do not comply with what their contracts say. And by Knox-Keene Act, are you referring to that aspect of that act, the Mental Health Parity Act? That's included, yes. Yes, but when you say they have responsibility to supervise compliance with, are you specifically referring to the Mental Health Parity Act? Yes, that's what's relevant to this case. Yes, and so you're saying you're reading that correspondence as having addressed the Mental Health Parity Act question? I don't think the Parity Act is mentioned in the letter. No, it's not. I think the letter focuses on the terms of the plaintiff's plan. No, the first letter addressed to your client focuses on medical necessity, and the answer focuses on medical necessity. And then the answer that's finally sent out by Mr. George says, well, medical necessity is taken care of, but it turns out that your plan doesn't cover. But the focus is on medical necessity. There's no mention at all of the Mental Health Parity Act, and as I read that exchange of letters, what Mr. George thought he was doing was addressing the question of medical necessity, and if that's what he's doing, the statute specifically says he's not making a coverage decision, even though he might have talked about the coverage. What the DMHC would have jurisdiction to do in this case is to determine whether the services she required were covered by a benefit of her plan, and that's what's addressed directly in Mr. George's letter. It says that according to the terms of your health plan contract, as described in your evidence of coverage, residential care is excluded for coverage. As counsel was licensed as a residential treatment center, rather than an inpatient facility, Blue Shield is not obligated to provide coverage for this treatment. No, no, I understand that. That's exactly the language that's troublesome to her. I perfectly understand that. But what I'm driving at is, what makes you think that he was addressing anything other than his responsibility under, let me get the statute number, 1374.30? Because if he's doing it under 1374.30, he has no authority to issue a coverage decision. He's addressing medical necessity. In his first letter of inquiry, your client was entirely focused on medical necessity. Well, we don't know what was in his mind, and he doesn't say in his letter. But I can read his letter. His first letter goes to questions of necessity. Sure, but he's also a regulator who deals with these issues every day, and he's aware that residential care is a benefit under, and I need to address something that the plaintiff has brought up here twice, that the appellant argues that residential care is an exclusion under the plan. That's not what the term exclusion means. An exclusion is something that would otherwise be covered. Is this now an argument addressed on, is this a plan-based argument or is this a statute-based argument? Well, it's both, because the statute requires coverage for some levels of care, and the question is whether this level of care is something that is required for parity. And we would suggest that what she received is residential care, which is a defined term, and it's not among the things the statute requires coverage for. And to the point. Now, when you say not among the things the statute requires care for, does that mean, is that based upon your argument that B1 through 4 is an exclusive list? That's what you're referring to when you say the statute doesn't require care for it? Even if we were to assume that the rule is as broad as the DMHC's regulations suggest, those regulations also don't say anything about requiring coverage for residential care, which, again, the appellant makes clear residential care is a well-understood level of care. In her brief, in this material submitted, there's no question that this is a discrete element of care. The DMHC has looked at this specifically. I mean, in a sense, the case to me is really simple. The Medical Health Parity Act, subsection A, says, every health care service plan contract issued, da-da-da-da-da, that provides hospital, medical, or surgical coverage shall provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses. Duh. I think you have a health care service plan that provides hospital, medical, or surgical coverage, and the statute says, well, if you're doing that, you've got to provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses. The statute tells us very specifically that anorexia qualifies as a severe mental illness. How do you get out from under that? Sure. The plan provides for coverage for the diagnosis and medically necessary treatment of severe mental illness. It does that on the pages that begin on the supplemental exercise record, page 103, and it goes on for about seven pages, talking about the different levels of care that are available. But then it excludes what I think the record tells us fairly clearly is the medically appropriate treatment for this medical necessity, which is to say residential care. She's not suitable for, unless you want to decide to put her into a hospital and bring in the people who can do the residential care in the hospital. I mean, I guess you could do that. But I don't think there's any serious dispute among the medical professionals that if you're going to treat anorexia of the sort that she has, she was in an appropriate placement. And the things that you offer are not appropriate placements for the anorexia that she had. The record actually does not contain any evidence or admissible evidence that that's the only way to treat an eating disorder. What the record does contain is proof that Blue Shield allows people with eating disorders to be treated at, among other places, outpatient clinics, inpatient hospitalization, partial hospitalization. These are all things that different facilities around the country offer. In fact, the plaintiff was offered inpatient treatment for eating disorders in Blue Shield-approved facilities. But she chose to go first, self-pay to her. Tell me what kind of an offer was made for a Blue Shield-approved facility. What facility was offered? It's in the Declaration of Joan Russo, which would be in the Supplemental Act. There's a record. I think I happen to have that. So what page are we talking about? It's in some call notes interpreted or described by Ms. Russo. And I'm not finding the immediate record. But it talks about her going self-pay at a facility. If you're saying that they made an offer for a treatment that was medically appropriate for the condition, I'd like to see it. I understand that. I'm sorry. I'd have to take a minute to find it. I hate to stand here and do it. But... Well, it was my understanding that she was given a list of non-residential facilities, but that was it. That's correct. The facilities that she was recommended treatment at would not be residential facilities because Blue Shield does not cover residential care at... Right. And so what I want to know is, okay, what were they? I understand that they weren't residential, but what were they? Did they come up to a skilled nursing facility or anything like that? I do not believe they were skilled nursing facilities. My understanding is that they would either be psychiatric hospitals or partial hospitalization on the psychiatric side. This would have been between April 10 and April 17, and I don't have it in my notes. All I have is that there was a list of non-residential facilities given, but I don't know what it was. I don't have it in my notes. Would it have included licensed therapists or a counselor or a clinical social worker, something analogous to a nurse? Yes, although there are... So the plaintiff focuses on skilled nursing facilities because that's the definition or that's one of the benefits that exists in her plan, but Castlewood has no doctors, nurses, or psychiatrists on staff. The facilities that Blue Shield would cover would have licensed mental health care professionals on staff. Yes. The thing that I was trying to get with counsel, and I guess I get to you, it seems to me that one could suggest that Blue Shield gives treatment for mental and physical illnesses at a skilled nursing facility, or at least that's your argument, and therefore, if she would go to a skilled nursing facility, you would have treatment. And the biggest problem that we have, and the reason we're in this comparison, is that there is no treatment at the skilled nursing facility for this particular thing. That the only place you can go is to the residential treatment center. That the only place that is similar in this particular situation, given the illness, is the thing that is similar then to the skilled nursing facility. And that's their big argument. And otherwise, you could win every time because you give, provide supervision, patient care planning, nutritional support necessary. You'll pay for all of that for both sides. But we're really talking about can they get the treatment that is similar. And they're saying the only treatment for this particular mental illness is residential treatment center. So the actual analog to residential care for mental conditions is assisted living for physical conditions. In both of those levels of care, you have people living in a facility that provides room and board primarily. It provides assistance with daily living, but they don't have on staff full-time licensed nurses. Assisted living centers are not covered by Blue Shield's plan either. This is a plan that covers licensed professional facilities of certain types, but not others. Not everything is a benefit of this plan. You know, the statute, I mean, there are various things to fuss with that we've been kind of fussing with, but the general thrust of the statute seems fairly obvious. The statute says if you're going to provide coverage for physical problems, you should provide medically appropriate coverage for severe mental illness. And as far as I can tell, the record's pretty clear that Castlewood, a residential treatment facility, is an appropriate facility. And I haven't seen anything that says that you do provide a facility or pay for a facility that is appropriate treatment for severe anorexia. So for starters, this is not the only Parity Act in the country. There are many across the country. Yeah, but this is the Parity Act that's at issue. Right. When the California legislature adopted this, there were other Parity Acts that covered, that required plans to cover residential care. By deciding not to do that, the legislature can be sued. You just said they decided not to do it. I'm not at all sure they decided not to do it. There's nothing in here that says we decided not to offer residential care. That's the issue. Sure. And when you get to a question of whether residential care should be covered or is an essential element of the treatment of mental illness, you get to a legislative question that involves the type of analysis that goes into legislation and that should be presented to the legislature. You know, I disagree with that. You don't want to turn those legislators into doctors. They basically said, at least on my gloss of the statute, you are required, if you're going to ensure physical conditions, to offer medically appropriate coverage for severe mental illness. But I don't think a legislator is in a good position to say precisely what is medically appropriate for particular conditions. If you look at the language of the Knox-Keene Act, which goes on for hundreds of pages, the legislature makes exactly those types of determinations. And here it has not made a determination anywhere. The word residential care doesn't appear anywhere in the Knox-Keene Act relating to mental health. Our legislature has not addressed that issue or has not deemed it to be worthy of coverage in the statute. And as to whether she was told that there were in-contract, in-plan facilities that she would attend, it's killing me, so I'm going to have to take a look through the documents. But I can represent to the court that she was told that there were in-network facilities she could go to and that her response to that was, I'm going to go to Remuter Ranch, a residential treatment center, and I'm going to pay out-of-pocket because it's not covered. I'm going to pay out-of-pocket. It doesn't say because it's not covered. I'm going to pay out-of-pocket because you're not going to pay for it. Yes. Whether that's covered or not, that's a different question. Okay. Listen, I know it's out of the order, but if while you're sitting there and we're getting the rebuttal you just happen to find it, you can tell us. Thank you. Okay. We've taken Mr. Pines quite a bit over. Why don't you start with three minutes and we'll see. This is an important case, and I want to make sure everybody gets to say what they need to say. Yes, Your Honor. I did want to mention that the first, it's important to note that the first ten days at Castlewood were paid by Blue Shield as inpatient. So that sort of started off as an excuse. And they said there was a problem. They shouldn't have done that. But we're really not back there, are we? We're really not back to the point number one. No, no, no. I'm just saying that this whole idea that they told her. I mean, that has more to do with point number one than it has to do with point number two. No, but the whole idea that they told her she could go somewhere else and she refused, and she went here to self-pay, they paid her to go here. So it wasn't like she was refusing to go somewhere else and was being obstinate and went here instead. Well, but the ones here were not residential. No, they paid it. It is inpatient hospital, and they claim it was a mistake. So the whole thing was confusing to everybody about where she should have gone. And that really this ought to be left to the legislature or something. I'm interpreting the statute, I think, pretty simply. I don't think it's a very complex statute. It requires comparable treatment and the end of discrimination against severely mentally ill people. I don't think it's a very complex statute at all. And because it is precisely because Blue Shield provides this level of care, subacute level of care to physically ill patients, that they have to provide it to mentally ill patients. I don't find this very remarkable. So you're not saying, you are not agreeing at all that it's a policy question? I think the legislature has spoken. There was a policy question, and that's been answered by the statute. Correct. I do want to correct one thing that I said about the survey. I said that there was no exclusion found, and I want to make a distinction between exclusion and coverage. There were no exclusions that the DMHC found. You do not, there were no coverage found, and that's because if you, my argument is if you don't offer the subacute on the physical side, you may not have to offer it on the mental health side. That's what parity is about. They did talk about policies that didn't have residential coverage. I'm not saying that they didn't. I'm saying that there was no, they did not discuss specific exclusion for residential coverage, and that's what we have here. We have lack of parity. Okay. I think we got it. Thank you. Now, just so Mr. Pines relaxes, we've got law clerks. They read stuff constantly. Okay. If they can't find it, we'll tell you. When I turned around, I remembered that the actual description of the coverage that was offered was in one of Ms. Russo's, or one of the plan's letters back, as opposed to the declaration that went to Sarnia. Yeah. Okay. So I think it's in the last letter, August 3, 2007. This would be supplemental excerpt to graduate 471, but it did in one of the earlier letters, 471. Yeah, but as I look at it, I'm not finding it there. You know, let's do it this way. If our ingenious and industrious law clerks can't find something, we'll send you a letter. But otherwise, don't worry about it. All right. Okay. Okay, thank both sides. Good arguments. Yes. Hard case. Excellent arguments. Yeah. Harlech versus Blueshooter, California submitted for decision, and we're adjourned for the day. Thank you. All right.
judges: Mills, Fletcher W. , Smith N. R.